NOT DESIGNATED FOR PUBLICATION

No. 117,532

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

MARTY FRY, Special Representative for
SHIRLEY A. SHELTON, Deceased,
*Appellant*,

v.

JAY HATFIELD MOBILITY, LLC,
*Appellee*.

MEMORANDUM OPINION

Appeal from Montgomery County District Court; F. WILLIAM CULLINS, judge. Opinion filed
April 27, 2018. Affirmed.

*W.J. Fitzpatrick*, of Fitzpatrick & Bass, of Independence, for appellant.

*Kevin D. Case* and *Patric S. Linden*, of Case Linden P.C., of Kansas City, Missouri, for appellee.

Before BRUNS, P.J., PIERRON and POWELL, JJ.

PER CURIAM: Shirley Shelton brought a negligence action against Jay Hatfield Mobility, LLC (JHM) after she fell out of a JHM loaner van and was injured. Two prior jury trials were reversed and remanded on appeal. At the third trial, the jury returned a verdict finding both parties 50% at fault and awarding no damages. Marty Fry, the representative for Shelton's estate, appeals, arguing the district court made numerous significant errors during voir dire and ruling on objections during trial. We affirm.

At the first trial, the jury found JHM 62% percent at fault and Shelton 38% at fault. Total damages were found to be $349,042.48, which resulted in a net judgment of

1

$216,406.34 after deducting the fault attributed to Shelton. JHM appealed, and the judgment was set aside and the case remanded for a new trial due to the trial court's error in instructing the jury on Restatement (Second) Torts § 324 (1964). *Shelton v. Jay Hatfield Mobility, LLC*, No. 106,394, 2012 WL 6634394 (Kan. App. 2012) (unpublished opinion).

Shelton died before the second trial. Marty Fry was substituted as the representative of Shelton's estate in what was now a survivor action. At the second trial, the jury found JHM and Shelton to be equally at fault, and no damages were awarded. Fry appealed, and the judgment was reversed because the jury had been allowed to assess fault to Shelton when there was no contention in the jury instructions that she was at fault. The case was again remanded for a new trial. *Fry v. Jay Hatfield Mobility, LLC*, No. 114,266, 2016 WL 3856195 (Kan. App. 2016) (unpublished opinion).

At the third trial, the parties stipulated to the amount of medical expenses and economic loss but disputed the amount of noneconomic losses. The prior testimony of Shelton, Rita Lashley, who provided home assistance for Shelton, and Dr. Walter Lajara-Nanson, a neurosurgeon, were read to the jury in lieu of live testimony.

Shelton suffered from polio at an early age, and it continued to affect her the rest of her life. In 2002, she began using a wheelchair. In 2008, she decided to buy new equipment in order to increase her mobility. She bought a van equipped with a platform and controls that accommodated her wheelchair. She also bought a motorized wheelchair, the 600 Jazzy Power Wheelchair, from JHM. Additionally, she paid to have JHM install an EZ Lock System pin in her new van so she could drive without getting out of her motorized wheelchair.

Linda Kennedy worked at JHM's Pittsburg office as a mobility specialist. She made an appointment to take Shelton to the JHM facility in Columbus, Kansas, on March

2

3, 2009, to install the EZ Lock pin. According to Shelton's understanding, Kennedy would drive Shelton to Columbus in Shelton's van, the system would be installed, and Shelton would return home that day in her own van. Shelton testified that Kennedy never told her there had been a change in plans before leaving for Columbus. Shelton testified she could have rescheduled if Kennedy had told her about the change of plans.

After arriving in Columbus, employees told Shelton they would not be able to complete the installation that day. Shelton would have to leave her van and motorized wheelchair in Columbus. Shelton testified she got into her manual wheelchair, and Kennedy loaded her into a loaner van from JHM.

When they arrived at Shelton's home, Kennedy stopped in the driveway. Shelton testified that Kennedy got out of the van and walked around the front to the passenger side. She opened the passenger side sliding door and then unfolded the ramp to the ground.  Shelton testified that Kennedy started talking on the phone and walked around the front of the van again. Kennedy opened the driver's side sliding door as she talked on the phone.

Shelton testified that she unlocked the brakes on her wheelchair and moved to about six inches from the ramp going out the passenger side sliding door. She was facing outside and she spoke to Lashley who was squatting down by the front tire picking up sticks in the driveway. Shelton was expecting Kennedy to unload her. Shelton said she sat there with her hands in her lap for about five minutes.

Shelton testified that all of a sudden, it felt like someone pushed her wheelchair and she started down the ramp. She tried to stop the wheels with her hands, but could not. At the bottom of the ramp, the wheelchair overturned and Shelton fell on the ground. Shelton said that when she looked back at the van, she saw Kennedy through the open sliding doors standing on the driver's side. Lashley called 911. Shelton testified that

3

Kennedy only came to check on her after emergency personnel arrived, but then never said anything to her.

Lashley provided home assistance for Shelton and accompanied Shelton on the trip even though she was not scheduled to work that day. Lashley testified that she was cleaning sticks off the driveway when Shelton was injured. She said that after Shelton went down the ramp, she turned around and saw Kennedy standing on the other side of the van in the driver's side sliding door.

Kennedy testified that the original plan was to drive Shelton to Columbus in Shelton's van and return with the van that same day. She knew before they left, however, that the plans had changed and that they would not be returning in Shelton's van. She did not recall if she had told Shelton about the change in plans.

Kennedy testified that when they arrived at Shelton's home, she opened both doors of the van to let some air in while she was preparing to unload Shelton. She denied being on her cellphone at the time. She stated that she intended to help Shelton out of the van the proper way by going around the van, walking up the ramp, and pulling Shelton out of the van backwards. According to Kennedy, Shelton did not need to move herself to the threshold of the van in order for Kennedy to help her get out. Kennedy would have stepped into the van and rolled Shelton out. Kennedy testified she was backing out of the van when Shelton was injured, and she did not see Shelton roll out of the van.

Kennedy stated she did not try to comfort or aid Shelton after the fall. She explained she was worried if she touched Shelton, it could make the injuries worse. Kennedy immediately called JHM to report Shelton's injuries.

Kennedy also testified it was part of her job as a mobility specialist to help people in manual wheelchairs down ramps. On the stand, she reread part of her deposition

4

testimony in which she had said it was not her job to help people in and out of vehicles. Kennedy stated that she should not have said that at her deposition. She said that she knew Shelton would need help getting out of the van, and she was the one responsible for helping Shelton. Her statement also contrasted with her deposition testimony, in which she stated it was not her responsibility to help Shelton out of the van.

Hatfield, the owner of JHM, testified that Kennedy did not violate any business or industry standard by opening the doors to the van before she was ready to help Shelton out. He felt, however, that Kennedy's response to the accident was not acceptable by company standards, and he would have expected her to at least show a little more emotion. Hatfield disciplined Kennedy for the incident, but he did not fire her.

The jury found JHM and Shelton to both be 50% at fault and did not award any damages. Fry appeals and argues the district court abused its discretion during voir dire as well as in ruling on multiple objections throughout the trial.

We will first consider whether the district court erred in denying Fry's challenges for cause to two jurors.

On appeal, Fry first argues the district court erred in denying challenges for cause to two members of the jury panel, Juror K.P. and Juror P. "The purpose of voir dire is to enable the parties to select competent jurors who are without bias, prejudice, or partiality." *Atwell v. Imseis*, 37 Kan. App. 2d 435, 436, 154 P.3d 511 (2007). We review a district court's decision on a challenge for cause for abuse of discretion. *Ridglea v. Unified School Dist.*, 206 Kan. 111, 113, 476 P.2d 601 (1970); see also K.S.A. 2017 Supp. 60-247(b). A judicial action constitutes an abuse of discretion if (1) no reasonable person would take the view adopted by the trial court; (2) it is based on an error of law; or (3) it is based on an error of fact. *Wiles v. American Family Life Assurance Co.*, 302 Kan. 66, 74, 350 P.3d 1071 (2015).

5

The district court has discretion to determine challenges for cause because it is in a better position to view the demeanor of prospective jurors during voir dire. *State v. Kackley*, 32 Kan. App. 2d 927, 936, 92 P.3d 1128 (2004). If a prospective juror shows actual prejudice or bias, however, the district court must grant a challenge for cause. *Getter v. Wal-Mart Stores, Inc.*, 66 F.3d 1119, 1122 (10th Cir. 1995). "Actual bias can be shown either by the juror's own admission of bias or 'by proof of specific facts which show the juror has such a close connection to the facts at trial that bias is presumed.' [Citations omitted.]" *Getter*, 66 F.3d at 1122.

*Juror K.P.*

At the time of trial, Juror K.P.'s teenage son was a defendant in an unrelated personal injury case arising out of a car accident. W.J. Fitzpatrick was representing the plaintiff in that lawsuit, and he had taken Juror K.P.'s son's deposition the previous week. During voir dire, Fitzpatrick asked Juror K.P. the following questions regarding the lawsuit:

> "[Fitzpatrick]:  Do you think that causes a problem for you to serve as a juror in this case?
> "[Juror K.P.]:  I had never met you prior to that.
> "[Fitzpatrick]:  I'm sorry? I can't hear you.
> "[Juror K.P.]:  I said, no, I had never met you prior to that. This is a completely separate incident, so, no, I do not feel  . . .
> "[Fitzpatrick]:  Okay. You don't hold a grudge or resentment?
> "[Juror K.P.]:  No.
> "[Fitzpatrick]:  Okay. And that case is proceeding, so it may take several more months or longer. Do you think you can serve as a juror in this case?
> "[Juror K.P.]:  If I am found to be a qualified candidate, yes.
>
> . . . .

6

"[Fitzpatrick]: . . . I am concerned a little about the fact that . . . my client has your son sued and we took your son's deposition last week and you were in there with your husband and him.

"[Juror K.P.]: Yes.

"[Fitzpatrick]: Seriously, don't you think that that might cause you some problems in the sanctity of the jury room?

"[Juror K.P.]: I would like to think it wouldn't. I leave that to your best decision.

"[Fitzpatrick]: But can you be absolutely sure of that?

"[Juror K.P.]: I am not looking at you in any ill will.

"[Fitzpatrick]: Okay.

"[Juror K.P.]: You are here representing that woman.

"[Fitzpatrick]: Right.

"[Juror K.P.]: And they're here representing their client.

"[Fitzpatrick]: Right.

"[Juror K.P.]: Two complete—

"[Fitzpatrick]: Okay.

"[Juror K.P.]: Separate situations.

"[Fitzpatrick]: All right. I take your answer then. Thank you."

Fry challenged Juror K.P. for cause. JHM told the district court that it might want to examine Juror K.P. The court took Fry's challenge under advisement until JHM was able to examine Juror K.P. JHM did not ask Juror K.P. any questions about her son's lawsuit during its voir dire. It did, however, challenge Juror K.P. for cause because Fitzpatrick's law partner had previously represented her. The court denied the challenge, explaining that "[Juror K.P.] said she could be fair to Fitzpatrick and that would all go over to [Fitzpatrick's law partner.]" The court never explicitly ruled on Fry's challenge for cause, and Fitzpatrick accepted the jury as selected and impaneled.

*Preservation*

Fry argues the district court erred in denying his counsel's challenge for cause to Juror K.P., but JHM argues that Fry has failed to preserve this issue for appeal. As JHM

7

points out, the district court never ruled on Fry's challenge for cause. While the district court did rule on JHM's challenge, JHM was challenging Juror K.P. for a different reason than Fry. Fry did not renew his challenge to Juror K.P. or request a ruling before the jury was impaneled. Arguably, then, Fry has waived his challenge when he agreed to the composition of the jury, and he cannot raise this argument on appeal. See *State v. Wilson*, 41 Kan. App. 2d 37, 200 P.3d 1283 (2008) (finding defendant waived argument that district court erred by failing to respond to her motion for a bill of particulars, where defendant failed to object to the lack of a ruling on her motion or renew her motion). JHM also notes that other jurisdictions require a party to renew its challenge to a juror before the jury is sworn if the court has not ruled on the challenge. See *Arnold v. State*, 755 So. 2d 696, 698 (Fla. Dist. Ct. App. 1999).

On the other hand, Juror K.P. appears to have served on the jury based on the record. Neither party has provided a list of prospective jurors or serving jurors, but the trial transcript suggests Juror K.P. was selected to serve. Because Juror K.P. served on the jury, the district court effectively denied Fry's challenge for cause. Admittedly, there are no findings on the record, and Fry did not object. Nevertheless, when no objection is made to a district court's inadequate findings of fact or conclusions of law, an appellate court can presume the district court found all facts necessary to support its judgment. *State v. Dern*, 303 Kan. 384, 394, 362 P.3d 566 (2015). Here, this court could presume that the district court found Juror K.P. would not be biased.

The only factually similar Kansas case appears to be *Rauscher v. St. Benedict's College*, 212 Kan. 20, 509 P.2d 1137 (1973). In that case, the plaintiff argued the district court abused its discretion in allowing a certain juror to serve. The *Rauscher* court noted that the plaintiff only made an "implied objection" to the juror which the district court overruled "for the moment." The district court did not enter a final ruling. The plaintiff had an opportunity to examine the juror more but declined to do so. The plaintiff also did not renew the challenge to the juror. 212 Kan. at 24. The *Rauscher* court ultimately found

8

the district court did not abuse its discretion in allowing the juror to serve. It did not specifically address whether the issue had been properly preserved. In its ruling, though, it noted that the plaintiff had passed on the panel without further examining the juror for possible bias. 212 Kan. at 25. This case does not appear conclusive either way on the issue of preservation of jury challenges.

*Abuse of Discretion*

The district court likely abused its discretion in denying Fry's challenge. The existence of a relationship between a prospective juror and an attorney is not automatically disqualifying. For instance, in *State v. Dixon*, 248 Kan. 776, 789-90, 811 P.2d 1153 (1991), the Kansas Supreme Court held the district court did not abuse its discretion in denying a challenge for cause to a juror who had previously worked in the same law firm as the district attorney. And in *State v. Ekis*, 2 Kan. App. 2d 658, 660, 586 P.2d 288 (1978), a panel of this court found the district court did not abuse its discretion in refusing to strike for cause a member of the jury panel who stated the county attorney was the attorney for her family business. In both *Dixon* and *Ekis*, however, the court based its decision in part on the prospective juror's unequivocal statement that he or she could be impartial. *Dixon*, 248 Kan. at 789-90; *Ekis*, 2 Kan. App. 2d at 660.

Here, Juror K.P. never made a definitive statement that she could be impartial. Rather, she told Fry that she "would like to think" the lawsuit against her son would not cause her problems in the sanctity of the jury room. She did say she did not have negative feelings toward Fitzpatrick. Contrary to what the district court stated, though, she never said that she could be fair to Fitzpatrick. Given the nature of their relationship, the district court should have conducted further inquiry and determined whether Juror K.P. could state unequivocally that she could be impartial. Thus, the district court erred in allowing Juror K.P. to serve on the jury without first verifying that she could be impartial.

Any error is compounded by the district court's ruling on JHM's challenge for cause, though neither party argues that ruling was erroneous. Juror K.P. stated that she had retained Fitzpatrick's law partner, Harry Bass, to go over a contract related to her job. She did not clarify how long ago this had occurred. She said she was satisfied with Bass' work, but she never commented on whether she could remain impartial. The district court found that Juror K.P. would be fair to Fitzpatrick and this would transfer to Bass, but Juror K.P.'s statements do not support this finding.

Fry claims in his brief that an erroneous denial of a challenge for cause is prejudicial as a matter of law. In support of this assertion, he cites to a case from Montana. *Reff-Conlin's Inc. v. Fireman's Fund Ins. Co.*, 309 Mont. 142, 148, 45 P.3d 863 (2002). Kansas does not appear to follow this rule, however. See, e.g., *In re Minney's Estate*, 216 Kan. 178, 184, 531 P.2d 52 (1975); *Atwell*, 37 Kan. App. 2d at 438-39. So, Fry still needs to show how the district court's error prejudiced him.

Because Fry simply asserts the erroneous denial of his challenge is prejudicial as a matter of law, he has not provided an argument as to prejudice. Arguably, then, he has waived and abandoned this issue. *Superior Boiler Works, Inc. v. Kimball*, 292 Kan. 885, 889, 259 P.3d 676 (2011). It is difficult to determine if the district court's error resulted in prejudice. Juror K.P. did apparently serve on the jury. However, the jury's verdict placed JHM 50% at fault and Shelton 50% at fault. This was the same as the verdict in the second trial.

The district court arguably abused its discretion by not further examining Juror K.P. to establish if she could be an impartial juror. Because Fry did not renew his challenge or request a ruling, however, the court was not given an opportunity to correct this error before letting Juror K.P. serve on the jury. See *McIntyre v. State*, 305 Kan. 616, 618, 385 P.3d 930 (2016) (failure to object to inadequate fact-findings or legal conclusions denies district court opportunity to correct alleged inadequacies). The record

10

suggests the court may have allowed her to serve without further questioning, but it does not definitively establish the court would have done so. Because Fry did not renew his challenge giving the court a chance to correct the possible error, one resolution of the issue appears to be to find the issue was not preserved. Even if it was preserved, the error does not appear to have resulted in clear prejudice.

*Juror P.*

Next, Fry argues that the district court erred in denying his challenge for cause to strike Juror P. due to her hearing impairment. The following colloquy took place during voir dire:

> "[FITZPATRICK]:  Let me see a show of hands of those of you that can hear me. Hold your hands up, please.
> "(Show of paddles.)
> "[FITZPATRICK]:  Ha-huh.
> "THE COURT:  Before Mr. Fitzpatrick goes any further, if there's ever a point in time where you cannot hear, shoot your hand up and just say, I can't hear. Because you need to be able to hear the evidence and the attorneys in order to make a decision in this case. So if you can't hear, let us know. Go ahead, Mr. Fitzpatrick.
> "[FITZPATRICK]:  Good morning, [Juror P.]
> "[JUROR P.]:  (No response.)
> "[FITZPATRICK]:  Good morning, [Juror P.]
> "[JUROR P.]:  Morning.
> "[FITZPATRICK]:  Oh. There you are. Do you have a hearing aid?
> "[JUROR P.]:  Yes.
> "[FITZPATRICK]:  Okay. You've had—have you been having trouble hearing us so far?
> "[JUROR P.]:  Yeah.
> "[FITZPATRICK]:  Okay. Do you have problems with both ears or just one?
> "[JUROR P.]:  Both.
> "[FITZPATRICK]:  Okay. I'm trying to figure out just how loud I have to talk for you to hear me. Can you hear me now?

11

"[JUROR P.]:  Yeah.
"[FITZPATRICK]:  Can you hear me now?
"[JUROR P.]:  No."

Fry challenged Juror P. for cause. He explained that they would be reading a lot of testimony, and he was concerned about Juror P.'s ability to hear. The district court denied the challenge. The court stated that Juror P. had trouble hearing when Fitzpatrick lowered his voice, but she did not have a problem when he spoke at an appropriate volume. The court also noted that Juror P. could be seated in a different position in the jury box if she had problems hearing.

On appeal, Fry argues that the district court erred in denying his challenge for cause. He contends that Juror P. was "practically deaf" and "it is doubtful she heard any of the evidence in this case or the court's instructions." He also alleges, "It is probable that due to her hearing impairment, she could not participate in the jury deliberations."

The Kansas Supreme Court has noted that, "'[w]hile a juror is not disqualified per se because of his deafness, [citation omitted], where the deafness is of such a degree as to indicate that the juror may have not heard material testimony, the juror must be disqualified, rendering any verdict he gave meaningless.'" *State v. Hayes*, 270 Kan. 535, 539, 17 P.3d 317 (2001) (quoting *Commonwealth v. Brown*, 231 Pa. Super. 431, 436, 332 A.2d 828 [1974]). The record here does not indicate that Juror P.'s hearing impairment was to such a degree that she was unable to hear material testimony. The district court explained that Juror P. could hear when Fitzpatrick spoke at an appropriate volume. The court was in a much better position to determine Juror P.'s competency under these circumstances because the written transcript obviously does not indicate how loudly Fitzpatrick was speaking. Additionally, the court offered to seat Juror P. in a position where she could hear better and advised the jurors to raise their hands if they had difficulty hearing.

12

Furthermore, Fry has failed to demonstrate that the district court's denial of his challenge for cause led to any error. Fry alleges Juror P. served on the jury, but he has not provided anything in the record to demonstrate that she did. There is no list of serving jurors, and no one ever read the list of jurors into the trial record. Because he bears the burden to designate a record on appeal, this omission works against him. *Friedman v. Kansas State Bd. of Healing Arts*, 296 Kan. 636, 644-45, 294 P.3d 287 (2013).

Additionally, there is nothing in the record to support Fry's claim that Juror P. likely did not hear any evidence in this case. Granted, this court has found a court abused its discretion when a juror stated she had not heard evidence and the court did not dismiss her. *State v. Miller*, 11 Kan. App. 2d 410, 722 P.2d 1131 (1986); see also *Hayes*, 270 Kan. at 537-40 (finding district court erred in not granting mistrial after juror indicated he had not heard testimony). That is not the case here. If Juror P. did serve on the jury, she does not appear to have ever indicated she did not hear testimony. Fry's claims that Juror P. likely did not hear any evidence and could not participate in jury deliberations due to her hearing impairment are pure speculation.

We next must determine if the district court erred in granting JHM's challenges for cause on two jurors.

Fry argues the district court erred in granting JHM's challenge for cause to two members of the jury panel, Juror D. and Juror D.S. During JHM's examination of the jury panel, JHM noted that Fry was an individual while JHM was a company. JHM then questioned Juror D. and Juror D.S. about any bias they might have because JHM was a company:

"[JHM'S COUNSEL]: Is there something before you've heard any evidence today that you think that somehow we've got more work to do to tell our story as opposed to the

13

other side? By a show of hands . . . for both of you gentlemen, are those perceptions that you have even before you've heard the evidence? Are those firm perceptions that you have, number 3?

"[JUROR D.]: Basically, you're the insurance company for the equipment; you have millions of dollars.

"[JHM'S COUNSEL]: Okay.

"[JUROR D.]: He's the Plaintiff for the lady that got injured. He's just trying to make ends meet.

"[JHM'S COUNSEL]: Okay. And that's your perception?

"[JUROR D.]: Yeah.

"[JHM'S COUNSEL]: Okay. And that's firmly held?

"[JUROR D.]: Yeah.

"[JHM'S COUNSEL]: Okay. Then is that the prism by which you're viewing what I'm doing already today?

"[JUROR D.]: Yep.

"[JHM'S COUNSEL]: Okay. Number 18 I believe was the other hand.

"[JUROR D.S.]: Yes.

"[JHM'S COUNSEL]: Same question to you sir. Tell me about your view.

"[JUROR D.S.]: Basically, I—I'm in the same boat. Big—big business, insurance, you got multimillion dollars in some cases. You did state it was a small business, but I'm not an accountant. But I'd put you behind more that—I'm going to go for the individual than the big company.

"[JHM'S COUNSEL]: Okay. Is that a firmly held belief?

"[JUROR D.S.]: Yes.

"[JHM'S COUNSEL]: Okay.

"[JUROR D.S.]: Just the struggles I've seen in life.

"[JHM'S COUNSEL]: I see.

"[JUROR D.S.]: So, yeah, you're behind the eight ball."

JHM challenged Juror D. and Juror D.S. for cause. Fry argued that JHM had yet to ask the jurors if they would be able to follow the district court's instructions not to show favoritism. The court found, however, that both jurors had firmly stated that they would favor the individual over the corporation and excused them.

14

On appeal, Fry argues that Juror D. and Juror D.S. had only expressed views during voir dire and that all prospective jurors have views. He contends the district court abused its discretion by excusing them without first determining if they were willing to set aside their views in accordance with the court's instructions. JHM responds that both jurors stated that they had a clear bias, justifying their dismissal. JHM also adds that Fry could have attempted to rehabilitate them but did not ask for the opportunity to do so.

Based on the record, the district court did not abuse its discretion in granting JHM's challenge for cause. A district court must grant a challenge for cause if a juror demonstrates actual bias. *Getter*, 66 F.3d at 1122. Both Juror D. and Juror D.S. stated they were biased in favor of the individual (in this case Fry) and this was a firmly held belief. While a question regarding the challenged jurors' ability to follow instructions not to favor one party or the other may have provided a more thorough examination, a reasonable person could agree with the district court's decision based on the record at hand.

We must also determine if the district court erred in limiting Fry's voir dire of a juror.

Fry argues the district court erred in limiting his examination of Juror M. during voir dire. Fry states that "[o]bjections to a question posed to a prospective juror during voir dire are comparable to a motion in limine" thus the appropriate standard of review for this issue is the one for motions in limine. Fry provides no authority for his statement that Kansas courts treat decisions on the extent of voir dire like motions in limine. Rather, this court reviews the district court's decisions on the extent of the examination of prospective jurors during voir dire for an abuse of discretion. *Atwell v. Imseis*, 37 Kan. App. 2d 435, 439, 154 P.3d 511 (2007).

15

Fitzpatrick engaged Juror M. in the following line of questioning:

"[FITZPATRICK]: You know, some people might say, Well, why are you going through this civil lawsuit for Mrs. Shelton. She's passed away. There's nothing that can help her now. She's not with us any more, and I kind of want to address that.

"And, [Juror M.], I'm going to pick on you, if that's all right.

"[JUROR M.]: Go for it.

"[FITZPATRICK]: Go for it.

"If you worked for a company, say, that had payroll every two weeks—okay?

"[JUROR M.]: (Nodding head.)

"[FITZPATRICK]: And you worked the full two-week period—"

JHM objected at this point, arguing the question was argumentative. Fry explained that many people do not understand that causes of action can survive death, and he was trying to address that. Fry told the court that "[t]he main thing is to get across to the jury that just because she's died, that does not mean that she has no claim and her claim has not survived." JHM's counsel responded that Fry was "trying to instruct the jury about a legal concept, which is not the purpose of jury selection. It's to determine qualified jurors." The court sustained the objection, explaining the question did not go to jury qualifications. The court added that Fry had been established as the representative of Shelton's estate, so that would resolve any confusion regarding survival of the cause of action.

On appeal, Fry argues that his question was intended to determine if Juror M. or any other jurors believed that a decedent's estate should not be able to recover damages which accrued before the decedent's death. At trial, however, Fry explained that he was attempting to make clear to the jury that a claim can survive a decedent's death. His stated goal was not to uncover potential bias but to clarify a legal concept. As such, it was not consistent with the purpose of voir dire, and the district court did not abuse its discretion in sustaining JHM's objection.

16

Fry also argues the district court erred in sustaining objections made during his opening statement and closing argument. The content and scope of opening statement and closing argument rest largely within the discretion of the district court. *Timsah v. Gen. Motors Corp.*, 225 Kan. 305, 316, 591 P.2d 154 (1979); *Skelly Oil Co. v. Urban Renewal Agency of City of Topeka*, 211 Kan. 804, 807, 508 P.2d 954 (1973).

*Opening Statement*

JHM's first objection during Fry's opening statement came after Fry's description of the braking system on Shelton's motorized wheelchair:

> "[FITZPATRICK]: . . . [N]ow, the other thing about this, if you turn to the second page of tab 1—this is a nice feature about that. That has an intelligent braking system . . . You guys know, you know, trucks go down steep—in the mountains they gear it down, all the way down, and they don't have to use their brakes. That's kind of—that may not be a good comparison, but it's what I'm trying to get across.
>
> "[JHM'S COUNSEL]: Objection. Argument.
>
> "THE COURT: Sustained.
>
> "[FITZPATRICK]: About the truck?
>
> "THE COURT: If you'll move on. Yes.
>
> "[FITZPATRICK]: Oh, okay. Anyway, you can go down the ramp with that and you can control your speed. As a matter of fact, you can go halfway down the ramp and stop, and—it's just got a toggle switch. That's what's—that's a nice feature about that. It's much safer than a manual wheelchair because once you go down a ramp on a manual, you know, those wheels get to going."

The Kansas Supreme Court has explained the purpose of opening statement as such:

> "The opening statements of counsel are generally no more than outlines of anticipated proof and are not intended as a complete recital of the facts to be produced on contested issues. Their purpose is to inform the jury in a general way of the nature of the action and defense; to advise it of the facts relied upon by the party to make up his cause of action or defense, and to define the nature of the issues to be tried and the facts intended to be proved, so as to better enable it to understand the case." *Miller v. Braun*, 196 Kan. 313, 316-17, 411 P.2d 621 (1966).

Because Fry was using an indirect analogy to explain the operation of the motorized wheelchair's braking system, his statements were arguably inappropriate for opening statement. The comment did not summarize the evidence to be presented at trial or outline what Fry intended to prove. Even if the district court erred in sustaining the objection, though, Fry has not explained how the error prejudiced him; thus, he has abandoned this argument. *Superior Boiler Works, Inc.*, 292 Kan. at 889; *Timsah*, 225 Kan. at 316 (finding appellant had not shown it was prejudiced by district court allowing certain comments during opening statement). Moreover, Fry does not appear to have been prejudiced because he was still able to address the operation of the braking system, just without the use of the truck analogy.

Next, Fry argues the district court erred in sustaining an objection to statements he made regarding whether Kennedy intended to help Shelton out of the van. The following exchange happened during Fitzpatrick's opening statement:

> "[FITZPATRICK]: Now, we get into all kinds of confusion as to whether Linda Kennedy intended to help her get out or not. Okay. And we'll get into that during the course of the trial. But it indicates to me, from what I can tell, she didn't have any intention of assisting—
> "[JHM'S COUNSEL]: Objection. It's argument.

18

"THE COURT: The last part will be stricken as argumentative. Go ahead, Mr. Fitzpatrick.
"[FITZPATRICK]: She had no intention of assisting Mrs. Shelton out of that. She didn't think it was her responsibility."

The district court did not abuse its discretion in sustaining this objection. The purpose of opening statement is to summarize what the evidence at trial will show. Counsel's conclusions drawn from that evidence are not appropriate for opening statement. Also, Fry has not explained how he was prejudiced by the court's ruling. Furthermore, Fry does not appear to have been prejudiced because he was still able to comment on Kennedy's intentions during opening statement.

Finally, Fry contends the district court erred when it sustained an objection to comments he made regarding Medicare and the right of subrogation. During opening statement, Fry discussed Shelton's medical bills incurred as a result of the incident. He explained to the jury, "Medicare pays, but they don't pay dollar for dollar; they discount. They have the right of subrogation. Some of you may know what that means." JHM objected and moved for a mistrial, arguing Fry's reference to a secondary payor was highly prejudicial. The district court sustained the objection but denied the motion for mistrial.

At trial, Fry did introduce evidence that Medicare had paid Shelton's medical bills and that Medicare would have to be repaid. Arguably, then, he should have been allowed to describe this evidence during opening statement. JHM also does not argue that the district court was correct to sustain the objection. Nonetheless, Fry has again failed to argue how this error prejudiced him and it is not clear from the record that any possible error resulted in prejudice.

19

*Closing Argument*

Fry also contests an objection made during closing argument. Fitzpatrick made the following comments during closing:

> "That's the secret to this whole case. Now, you can go back in that jury room, and you can discuss for an hour what happened in that driveway. [But] . . . if you follow the trail to what started the whole train of events that led inevitably to her injury, it's that moment where she deceived or failed to tell Marty and Shirley—"

JHM objected to the use of the word "deceived," explaining there had been no claim of deception or any allegation of fact that Kennedy had deceived Shelton. He added that Fry was using the word "deception" for the first time during closing argument. Fitzpatrick responded that "[t]here's deception throughout this case . . . by Linda Kennedy." The district court asked if the jury should decide whether Kennedy withheld the information intentionally or inadvertently. JHM responded that it was not an issue for the jury because this was the first time Fry had made any claim of deception. The court sustained the objection and admonished the jury to disregard the word "deceived."

Black's Law Dictionary defines "deceit" as "the act of intentionally leading someone to believe something that is not true." Black's Law Dictionary 491 (10th ed. 2014). Deceit was not an element of Fry's negligence claim nor was it one of Fry's claims as presented to the jury. Because Fry was introducing this claim for the first time in closing argument, JHM had not had an opportunity to develop a defense at trial against the claim. Therefore, Fry's use of the word "deceived" arguably invited possible prejudice against JHM, and a reasonable person could agree with the district court's decision to sustain the objection.

Nonetheless, any possible error on the part of the district court did not result in prejudice to Fry. Fry claims that Kennedy's failure to inform Shelton of the change in

20

plans was an integral part of his negligence claim. But even with the court's ruling, Fry was still able to present evidence and argument that Kennedy had failed to inform Shelton about the change in plans. Thus, Fry has failed to demonstrate how he was prejudiced by any error.

Finally, Fry argues the district court erred in ruling on evidentiary objections during Hatfield's and Kennedy's testimony. He argues the district court abused its discretion when it overruled Fry's objection to opinion testimony provided by Hatfield. He also asserts the district erred in sustaining JHM's objections to questions he asked Kennedy because they were leading or not relevant.

*Jay Hatfield's Testimony*

During direct examination, JHM asked Hatfield, "So, in this circumstance, do you find any quarrel with what Mrs. Shelton—what Ms. Kennedy did by bringing that van to a halt upon arrival in Coffeyville and departing the van and opening both doors such that there may be air for Mrs. Shelton at that point?" Fry objected, arguing the question called for an opinion. JHM responded he was attempting to establish whether Kennedy's behavior was in accordance with JHM company rules. The district court overruled the objection, explaining that Hatfield should be able to testify to his expectations of his employees.

Later, JHM asked Hatfield the following questions:

"[JHM'S COUNSEL]:  Was [Kennedy]—she retired. She was not fired because of what occurred on March 3rd of 2009?
"[HATFIELD]:  No. She—
"[JHM'S COUNSEL]:  Was she disciplined because of it?

"[HATFIELD]: Well, yeah. I mean, we talked to her about it and wrote her up for a situation happening. But it was, you know, really and truly—I mean, when we looked at all the sides of it, it was an accident."

Fry objected, again arguing Hatfield was providing an opinion regarding who was at fault. JHM explained that he intended his questions to elicit testimony regarding whether Kennedy was disciplined or fired in response to Hatfield's testimony that she retired. The district court overruled the objection, explaining the response was actually related to what happened to Kennedy after the accident.

"Whether a witness is qualified to testify as to his opinion is to be determined by the trial court in the exercise of its discretion." *Schmeck v. City of Shawnee*, 232 Kan. 11, 31, 651 P.2d 585 (1982).

In their arguments, both parties discuss *Lollis v. Superior Sales Company, Inc.*, 224 Kan. 251, 580 P.2d 423 (1978), a case regarding expert opinions in automobile accident negligence cases. There, the Kansas Supreme Court held that "[i]n an automobile accident negligence case, an expert witness . . . may not state his opinion as to which of the parties was at fault in causing the accident or his opinion concerning what acts of the parties contributed to the accident." 224 Kan. 251, Syl. ¶ 3. Hatfield, however, was not certified as an expert witness, nor does either party argue the district court should have treated him as such. Thus, *Lollis* does not seem directly applicable in this case.

Notably, neither party cites to K.S.A. 2017 Supp. 60-456, which is the statute governing the opinion testimony of both lay and expert witnesses. That statute states, in relevant part,

"(a) If the witness is not testifying as an expert, the testimony in the form of opinions or inferences is limited to such opinions or inferences as the judge finds: (1) Are rationally based on the perception of the witness; (2) are helpful to a clearer

22

understanding of the testimony of the witness; and (3) are not based on scientific, technical or other specialized knowledge within the scope of subsection (b).

"(b) If scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue, a witness who is qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise if: (1) The testimony is based on sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the witness has reliably applied the principles and methods to the facts of the case.

. . . .

"(d) Testimony in the form of opinions or inferences otherwise admissible under this article is not objectionable because it embraces the ultimate issue or issues to be decided by the trier of fact."

Fry argues that Hatfield's statement that "it was an accident" was inadmissible because a lay witness may not offer an opinion regarding who is at fault. Arguably, Hatfield's statement does go to who is at fault for Shelton's injuries. In context, though, Hatfield was explaining the company's decision to discipline Kennedy but not fire her. This makes the opinion admissible under K.S.A. 2017 Supp. 60-456(a), because it provided a clearer understanding of JHM's conduct with regard to Kennedy. Furthermore, while JHM may have determined for company purposes that Kennedy was not at fault, this does not necessarily determine whether Kennedy was legally at fault for the accident. So, the district court did not abuse its discretion when it overruled Fry's objection.

*Linda Kennedy's Testimony*

*Leading Questions*

Fry also argues the district court made errors ruling on objections during Kennedy's testimony. First, he contends the court erred in sustaining an objection that his questions were leading. "'Whether leading questions should be permitted in a particular

case rests with the sound discretion of the trial court.'" *State v. Humphrey*, 30 Kan. App. 2d 16, 21, 36 P.3d 844 (2001).

Prior to trial, Fry filed a motion in limine asking the district court to find Kennedy a hostile witness and allow Fry to use leading questions on direct examination. JHM filed a response, arguing any such determination would be premature because Kennedy had yet to provide any testimony in the third trial. At a motions hearing, the district court denied Fry's motion, finding the request to find Kennedy a hostile witness to be premature. The court added that Fry could renew the request during Kennedy's testimony if necessary. Fry never renewed the request.

During Fry's examination of Kennedy, he asked her, "[W]ell, on the motorized wheelchair there's no handles like on a manual wheelchair to move?" JHM objected to the question as leading, and the district court sustained the objection. Fry rephrased the question, asking "[D]oes a motorized wheelchair have handles like a manual wheelchair?" Kennedy answered, "Not in the back, no."

Fry then asked Kennedy, "So when you got to Columbus, then, it was just a matter of getting the unloading platform, hydraulic unloading platform, to drop her to the ground?" JHM again objected to the question as leading, and the district court again sustained the objection. Fry protested that the questions were simple, and the court responded, "I know. And it does speed the process up a little bit, but there is a rule against asking leading questions."

Fry's only argument regarding these objections is that his questions were not leading. He appears to contend that the subject matter of his questions illustrates that they were not leading. He claims that "[a]sking Kennedy if its true that the handlebars on a manual wheelchair [are] located on the back is not leading." He also asserts that "[a]sking

24

Kennedy if unloading Mrs. Shelton at Columbus from her handicapped van was just a matter of utilizing the electric lift is not leading."

The form of a question, not its subject matter, determines whether it is leading. "A leading question is one in which the examiner suggests the answer desired from the witness." 3 Barbara, Kansas Law and Practice, Evidence § 9:8 (5th ed. 2017). The questions at issue were essentially statements suggesting that Kennedy should agree, so they were leading.

Granted, a party may use leading questions on direct examination if the witness is hostile or if the witness is an adverse party. K.S.A. 60-243(b). Here, Fry moved to have Kennedy declared a hostile witness. The district court denied the motion, and Fry did not renew it during trial.

Even if the district court did abuse its discretion, though, Fry does not explain how the district court's ruling prejudiced him. See *Essmiller v. Southwestern Bell*, 215 Kan. 74, 79, 524 P.2d 767 (1974) (finding court's error in disallowing leading questions did not result in prejudice). He has not argued that he was unable to elicit the necessary testimony without the use of leading questions. In fact, after the first objection, Fitzpatrick was able to elicit the desired testimony without use of a leading question. Thus, even if the district court did err, Fry's claim would still fail.

*Relevance*

Next, Fry argues the district court erred in sustaining an objection to his examination of Kennedy based on relevance. Generally, speaking, all relevant evidence is admissible. K.S.A. 60-407(f). K.S.A. 60-401(b) defines relevant evidence as evidence having ""any tendency in reason to prove any material fact."' [Citation omitted.]" *State v. Page*, 303 Kan. 548, 550, 363 P.3d 391 (2015). This definition encompasses two

25

elements: a materiality element and a probative element. Standards of review for each element vary.

Evidence is material when the fact it supports is in dispute and is significant under the substantive law of the case. *In re Acquisition of Property by Eminent Domain*, 299 Kan. 37, 44, 320 P.3d 955 (2014). The appellate standard of review for materiality is de novo. *State v. Page*, 303 Kan. 548, 550, 363 P.3d 391 (2015). "'Evidence is probative if it furnishes, establishes, or contributes toward proof. Probativity is reviewed for abuse of discretion.' [Citation omitted.]" *State v. McCormick*, 305 Kan. 43, 47, 378 P.3d 543 (2016).

Fry asked Kennedy the following series of questions:

"[FITZPATRICK]: . . . Did you ever call or contact Mrs. Shelton after [the accident]?
"[KENNEDY]: No, I did not.
"[FITZPATRICK]: Have you ever talked to her since?
"[KENNEDY]: No, I have not.
"[FITZPATRICK]: Have you ever sent her a card or a get-well?"

JHM objected to the last question on the basis of relevance, and the district court sustained the objection. Fry then asked Kennedy, "What, if any, contacts have you had with Mrs. Shelton since that incident?" Kennedy responded she had not had any.

On appeal, Fry generally argues that Kennedy's failure to have continuing contact with Shelton after the accident is relevant to Kennedy's fault. He explains that Kennedy's failure to maintain contact indicates Kennedy's feelings of guilt. Nevertheless, he does not specifically explain how the question regarding the get-well card was relevant. Additionally, he did not cite the correct standard of review for this issue nor did he provide any argument regarding materiality or probativity.

26

In its brief, JHM also does not cite the correct standard of review for this issue or provide any argument that the question about the get-well card was not relevant. Instead, JHM claims that even if the question was relevant, it was cumulative. At trial, however, JHM did not object to the question as cumulative so this argument was not preserved for appeal. K.S.A. 60-404. Arguably, then, both parties have failed to adequately brief this issue.

Assuming, without deciding, that the question was relevant, however, the error did not prejudice Fry. Fry was able to produce other evidence that Kennedy had failed to maintain contact with Shelton, including her admission that she did not have any contact with Shelton after the accident. In fact, in his brief, Fry recites much of the evidence he was able to produce at trial illustrating Kennedy's purportedly guilty behavior, such as her failure to render aid to Shelton, and her failure to talk to anyone at the scene other than a brief comment to Lashley. Thus, this argument fails.

*Conclusion*

Fry has challenged multiple district court rulings on appeal, but his challenges mostly fail. The district court did not err in denying Fry's challenge for cause to Juror P. because the record does not indicate her hearing impairment would have or did prevent her from hearing testimony. The court did not err in dismissing Juror D. and Juror D.S. because both jurors stated they were biased. The court did not err in limiting Fry's examination of Juror M. because Fry was attempting to explain a legal concept rather than determine jury qualifications. Any possible error in sustaining JHM's objections during Fry's opening statement and closing argument did not result in prejudice. Similarly, the court's ruling on JHM's evidentiary objections were either not erroneous or did not result in prejudice.

27

As for Fry's challenge to Juror K.P., it is unclear whether this issue was properly preserved. However, even if it was, we do not find the outcome of the trial would have been different or that the alleged error resulted in prejudice. Although the trial of this case may not have been perfect, we find that it was fairly conducted.

Affirmed.